May it please the Court, Daniel Powell for the State Defendants, Governor Schwarzenegger and Comptroller Chung. At issue in this case is whether a federal district court can seize $8 billion for a prison construction program that is on its face in excess of constitutional requirements. The Prison Litigation Reform Act, or the PLRA, expressly bans the construction of prisons. How do you get to that question? You're appealing, I think, an order to pay $250 million, and I didn't see any six or seven billion figure in it. I know that there were plans in which the state acquiesced that talked about 5,000 and then 10,000 beds of construction, but that was part of agreed proceedings that, so far as I know, you haven't asked to be relieved of. Well, a couple of responses, Your Honor. First, in the receiver's motion for contempt or any alternative for funding, he did request $8 billion. In the very first sentence of his motion, he says, it is with great reluctance and yet a sense of firm conviction that the receiver seeks this court's assistance in securing payment by the State of California of the $8 billion in funding necessary for the receiver's construction program. And on page 31 of our reply brief, we include the chart that he included in his brief and in the supporting declarations listing, you know, 2.6 billion needed in next fiscal year, 3 billion needed in the fiscal year thereafter. And at the very end of the hearing, October 27th, Judge Henderson said, quote, it is clear to me that we must move forward to adjudicate the receiver's contempt motion with all due haste. So I'm instructing you, Mr. Kelso, the receiver, and Mr. Brosnahan, to proceed full speed ahead. And so it really is about $8 billion. And simply because the receiver has carved it up into an initial payment of $250 million, it doesn't change the fact that the plan before the district court and what the district court concluded did not violate the Prison Litigation Reform Act was an $8 billion plan. And so I do think that this really is about that amount of money. Is it the State's position that there was no consent order or consent decree? Well, there was certainly a consent decree in 2002 and 2004. And those consent decrees dealt with issues regarding hiring and training of physicians. With respect to this order, the order that you've appealed from, does it arise out of a consent decree or not? No, Your Honor. We don't believe that it does. Then why wasn't your response to Judge Henderson to say there's no consent decree? Well, our response was — You were not obligated to pay this. Well, our response always in the district court was that every time the court — we had agreed to construct prisons given the requirement that they be funded through lease revenue bonds. And so in every instance where the district court, when it approved the turnaround plan of action, that included a requirement that the receiver use lease revenue bonds. In the coordination agreement, where the four courts said that this plan is what we want going forward, it was conditioned on the use of AB-900 funds, which were also lease revenue bonds. And even in the — Revenue bonds can be issued on condition that the legislature appropriate the money, or did it just explore possible routes of finding the money? Well, Appendix A to the turnaround plan of action expressly states that the funding for the program will be used through lease revenue bonds. In the final page of the coordination agreement, it says that 8,000 of those beds will be used through AB-900 funds. And I don't think that you can separate these orders out. One of the reasons why the State consented to all of this was because it was under the requirement that it would — the receiver would use lease revenue bonds, because that's how construction in California is done. All construction, or virtually. So we now — we don't ever have a ruling of the district court in response to that kind of an argument. In other words, that — that our agreement to any construction was conditioned on this or conditioned on that, I don't think we have a finding or a ruling of the district court. Well, I think in his — in his November, I think, seventh decision denying our application to stay, he does explore that and — and rejects that contention. Oh, and that order wasn't appealed. Well, I think it's — I mean, I think that the — the order denying our application to stay pending this appeal is subsumed within the notices of appeal, the order that we were seeking — seeking to stay. I guess what I'm feeling some discomfort at is that we've got an appeal from an order to pay 200-some million dollars or show why you shouldn't be held in contempt for failing to pay it. And yet we're — we're seeing a challenge to a lot of things that seem to have been agreed on beforehand. And maybe you're right that you had conditions that haven't been fulfilled and so on, but we don't — we don't have anything that the district court has been presented with and ruled on in that regard that is being appealed to us. And — and I — we — I wind up, at least — I can't speak for the rest of the panel — feeling that I'm being asked to make a ruling seeing the tip of a very large iceberg and I don't know what the district court's resolution of some of these perhaps factual arguments might even require more evidence to be taken, what it would be. Well, Your Honor, I think — I'm reviewing. Again, I think that the — although the actual order for payment is itself a relatively short order, the district court certainly explained its legal conclusions in the order denying our application for stay pending appeal to this court of that order for payment. And I think — and in that order, he says that the Prison Litigation Reform Act does not bar prison construction, that he has equitable authority outside of the PLRA to order the construction of prisons. He's concluded that he doesn't need to make the findings required by 3626A1A regarding the scope of the plan, whether it exceeds constitutional requirements. And I have no doubt that, you know, if we were to go back before the Court, he — he has laid the frame — Judge Henderson has laid the framework for future orders for us to pay whatever the next step is in this construction argument. And if we were to go back before the district court and the receiver would — took up Judge Henderson's, in a sense, oral order to continue with the contempt proceedings, we've litigated these issues now. We presented to him our argument that the PLRA banned prison construction. He rejected it and ordered us to begin funding this prison program. And I think the State would be faced with an untenable situation where no order is final. We pay $250 million now. We pay a billion dollars next year, and so on and so forth. And — It depends, doesn't it, on just assuming that we were of a mind to send it back to Judge Henderson, that we wouldn't, say, examine all of the State's contentions, including the ones about conditions, et cetera, and issue a final ruling or a final judgment. Well, I think that that's appropriate with respect to the requirements that the construction plan be narrowly tailored, go no further than necessary, and be the least intrusive means. However, I do think that it would be appropriate for this Court to resolve the purely legal question of whether or not the district court has the authority, notwithstanding the language in the PLRA, to order the construction of prisons. That's a purely legal question. Well, what language in the PLRA forbids it? 3626a1c, Your Honor. It says nothing in this section shall authorize. That doesn't prohibit anything. Well, I think Congress certainly intended that language to have some meaning. As this Court — Yeah. It means we shouldn't — that if you're leaning on this statute to authorize the construction of prisons, it's insufficient. You can't do it. Well, Your Honor, I think, first of all, this Court in Gilmore and the Supreme Court in Miller recognized that the whole purpose of the PLRA was to limit courts' equitable authority. And that's reflected in the text. Yeah. And it is true. It's limited to correcting a constitutional condition. It can correct constitutional violations, and Congress didn't want them to go beyond that. Of course, if you're consenting to a program, as your brief, I think, points out. You can go beyond it. I mean, you can do by agreement whatever you want to do. Well, I would say first — And for a while, there was an agreement or at least an acquiescence here. Well, first, again, the State only agreed to this insofar as the receiver agreed to use lease revenue funding. He is now seeking to do it on his own authority or the Court's authority. So I think that's one point. The second point is even consent decrees have to comply with the requirements of 3626a1a. Congress, in passing the PLRA, was very concerned about the time and effort courts were taking in overseeing vast portions of prison systems. And so I think it did fully intend to limit courts' equitable authority, and I think that's — that is made clear in the phrase in 3626a1c that says, courts in exercising their remedial authority. That's a recognition that it is — it is not within the Court's equitable authority to do so. If he — if a court had equitable authority outside of that section, the in exercising the remedial power section would be rendered meaningless. By the way — well, I don't want to interrupt your train of argument, but sometime this morning, I'd like to know how the remedies that are going forward here, presumably, intersect with what was ordered the other day in release. Does that — I mean, it's hard to believe that these cases don't have some effect on each other if they all are carried to their logical conclusion. Oh, sure. I mean, this is a very complex web of cases. Let me just say one thing about the equitable authority, and then I'd be happy to answer your question. Sure. I just want to say that the House report accompanying the PLRA said that the purpose of subsection A was to, quote, stop judges from imposing remedies intended to affect an overall modernization of local prison systems or provide an overall improvement in prison conditions. Clearly, prison construction is one of the prime examples of that. And so clearly, Congress intended to limit courts in that area. But with respect to your question, Judge Canby, certainly the district court's tentative ruling — I assume that's what you're referring to last week. It is. The tentative prison release order. On one hand, it doesn't affect whether or not the district court had the authority to construct prisons in the first place. If the court doesn't have authority under the PLRA, then what happened last week isn't going to affect that question. Well, certainly some prison construction could be ordered consistently with the PLRA, couldn't it? I mean, if you have — if it's the absolute minimum necessary to remedy a constitutional condition, the court presumably could order construction. I don't think so, Your Honor. I think the PLRA bans it in any circumstance. And in the — in the tentative prison release order, the three-judge panel even says the PLRA may ban construction of prisons. So that panel was certainly aware of the problem. Where it does impact our case is if the court were to conclude against what I think is the plain language of the PLRA, that no prison construction — that prison construction is permissible. If that order were to become final and not appealed or the order was affirmed on appeal, then the fact that a significant number of prisoners were released would certainly affect the number of beds that would need to be constructed. So do I understand correctly that we have a — understanding it's a tentative ruling, we have a three-judge panel, two district judges and a Ninth Circuit judge, saying that the PLRA may prohibit prison construction and therefore 50,000 inmates have to be released? Do I have the number right? I think it's between 35 and 50, Your Honor. Yes. And one of the members of that panel in another case saying that because the prisons are so overcrowded, you have to build prisons. That's right, Your Honor. But just logic would seem to me that this all ought to go back either to the three-judge panel or direct Judge Henderson to fold this matter into the three-judge panel and have a resolution of it. The State — I mean, I have some sympathy with the State if it's facing an order, A, to build a bunch of prison beds, but, B, being told to — because they can't build prison beds to release a bunch of prisoners. I have some sympathy with that. Well, I would just say as a technical matter, the three-judge panel is limited to a prisoner release order. And so I don't think it would be able to — They determined that, my understanding. It's correct? Right. Yes, Your Honor. Because that panel as a group views the PLRA as a barrier to ordering new prison construction. That's right, Your Honor. And we think that is correct. We think — Has Judge Henderson ever been — had this dichotomy presented to him? Judge, you have ordered us to spend money to build prison beds, but this three-judge panel you're on has said you can't build prison beds, so release these guys. Well, I don't — I mean, I don't want to — the three-judge panel order said may not allow. It didn't say it wouldn't. So I don't think the State is bound that way. Well, we have different plaintiff classes, too. There are two plaintiff classes. So the three-judge panel was convened pursuant to an order in Plata, which deals with medical care, and Coleman, which deals with mental health care. They both issued orders in the same day convening a three-judge panel. And so — and then this Court consolidated the two into one proceeding. And so the three-judge panel represents both mental health and medical. But that's what the receiver is doing here. Through the coordination agreements, he's providing beds for both classes. All right. Let me ask you this, just in a broad way. If I understand it, two years ago, there was an order appointing a receiver, and that was not appealed. That's correct, Your Honor. And that is not at issue here. No, Your Honor, it's not. Now, we are battling back and forth in various courts about the authority of a court to order construction of beds or prison, provision of beds or construction of prisons. But in your view, just generally, in the State's view, the order appointing the receiver in the context of this litigation, what were the broad boundaries of what the receiver was supposed to do? Well, I think that the order appointing the receiver should be viewed in the context in which it was entered. And that context is there was a prior consent decree. The State couldn't meet its terms, and so there was another decree in 2004. And both of those consents of And those related to? Those related to the hiring and training of nurses and physicians to treatment of high-risk patients. And so when the order appointing the receiver was entered, it was in the context of the State's inability to comply with those orders. And so I think the OAR, excuse me, is really about hiring and training of physicians, changing treatment protocols, areas in which the receiver has actually been very successful. And if you look at the powers of the receiver in the OAR, it's the powers that were given to the Secretary of Corrections with respect to the provision of health care. And, of course, hiring and training physicians and changing treatment protocols are well within the authority of the Secretary of CDCR. But then there's a plan and there's a turnaround plan, and they are adopted by the receiver. They talk about construction and the turnaround plan certainly does, but it also talks that they will be funded through lease revenue bonds, which is a requirement he's ignoring here. But, of course, that still is construction. You're saying that there can't be a construction order. We say that the Court can't order construction. Now, the State can certainly agree to it. And the State has passed AB 900, which authorizes $7.4 billion for prison construction and $1.14 billion for medical, mental health, and dental beds. And certainly it intends for that construction to go forward. And that is something the State, through its legislature, can do. The question is whether the district court, acting only on its own authority under the PLRA, can order that construction. And I think the language of the PLRA and the legislative history make clear that acting by itself, it cannot order that construction. Can I reserve the rest of my time for rebuttal? Thank you. If it pleases the Court, my name is Jim Brosnan. I represent the receiver in this matter. Welcome back to Arizona. Thank you, Your Honor. I started there, as I guess Your Honor knows. And then I started in this building a certain number of years ago. The Court, please. What is before the Court, in our view, is an order on October 27th that orders the State to pay $250 million for the purpose of rejuvenating existing structures that relate to health. The receiver, as you know, is over most of the health budget in the California prisons. And to plan the need for construction. The word plan should go directly to the question of this Court's jurisdiction. It is a moving target. There is no construction that the Court could comfortably look at and say, here, this is or is not a problem under the PLRA, in our view. And I'd like to discuss two things briefly. One is jurisdiction, and the other is the PLRA, if I may. And I will respond a little bit to the three-judge tentative opinion that came down this week. Because the good judicial instinct to deal with this as a whole is understood by us. We'd like to address it and try to be helpful to the Court in that regard. First of all, as to jurisdiction, the question before the Court is, should the Court exercise jurisdiction whether by jurisdiction or mandamus? In this case, where there is no contempt, there are no sanctions, it's not final, it's clear the district court's intention was that it not be final. Where a hearing was scheduled in the alternative, if the money is not paid, we don't know if the money will be paid or not. It never got to that. And the judge said by a certain date, November 7th, you'll tell us who the witnesses will be, so there will be a hearing. That's interesting. It's one of the arguments, it seems to me, the State's making is, well, look, in a contempt hearing, there's only one issue, did we pay the money or didn't we? It can be a very short hearing. And we're not allowed to attack the underlying order or the legitimacy of it or anything else. What's your response to that? Well, my response to it is that they have also brought it, as Your Honor knows, we filed this and asked for judicial notice. They filed a motion to terminate the receivership. And so that is yet a third area that is to be certainly considered by the court. That's going to have to be dealt with also. As to what would happen in the hearing, the question is who would the witnesses be and what would be the scope of the hearing? We don't know that. If I may say, the court doesn't know that. We haven't got there. You don't have a record on it. And so this is very precipitous by the State in a jurisdictional, not a personal sense, but in a jurisdictional sense to take this matter up here. It is this question of — Now, if the money is not paid and there is a hearing, you must have some notion of what — I do. — the strategy you're going to follow. I do.  possible to make the payment? I imagine they could. They could try. The problem the State has, to be very direct with the court as to what we're going to say, we're going to say that in the turnaround plan of action, which was pending for three months, which they studied, they agreed to it in S.E.R. 15 to 18. They agreed to construction in this case as a planning matter. We're going to say that on the construction coordination agreement, which is in S.E.R. 19 to 28, the State agreed. We're going to say that the master application for order opposing State law waivers at 53-64 and 68, they agreed again. They agreed for seven and a half years of litigation, not only with the injunction, not only with the receiver, not only did they embrace publicly that the State was working towards a solution to these problems, not only did the governor declare a state of emergency, which is still in existence, but they took it over to the three-judge court and they gave it as a reason repeatedly as to why nobody should be released. And so the State, until I'm going to say July of 2008, agreed time and time again, raised no issue about the PLRA, never said during that seven and a half year period, construction is prohibited in a way. And the interesting question, which we hope the court doesn't get to at this time, the interesting question is, you mean that Congress could say no construction, even though construction might relate to the question under the Eighth Amendment of the United States Constitution that prisoners are being denied their rights under that amendment? Congress never intended to do it, as Your Honor indicated in the language. It says nothing in this statute. We gave cases, the Cabazon case and others, that interpret that kind of language. There are many interesting philosophical discussions about how to interpret statute, but plain meaning is still current, and there it is. So from our view, yes, there is a problem. Now, the record shows something that relates to the three-judge court because the receiver and the people working for the receiver have anticipated that such a thing might happen. And so the release order does not materially affect the need for receivers' construction plans. And this is in the record, if the court please, at paragraph 12 of Dr. Terry Hill's affidavit. It's a big record, I understand, but SER 72. In 2008, we asked ABT associates to revisit their bed need projections, taking into account custody levels, the CDCR's new population projections, and the possibility of a mass release scenario. ABT's new study concluded that even if none of the hypothetically released inmates return to custody, that's if everybody was released under what was then being discussed, long-term care needs would still remain over 4,500 beds. My concern is that my argument this morning, that I would lose myself in the cases of jurisdiction or the interpretation of the PLRA, and that somehow I would fail to describe, at least in a few words, what's involved in this case. These are prisoners in the California prison system, which is huge. There are 172,000 prisoners in that system. And, yes, they have all committed crimes and been convicted. Yes, it's true. But they did not receive death penalties in the judicial system, and they are dying. The state, in its brief, says they are tired of hearing it. Well, this much is true, and I agree with my colleague. They have heard it since 2001. So now, what is the law here? Where is the Eighth Amendment? And how soon can we get back before Judge Henderson, about whom I'd like to say a word, if you don't mind? Since 2001, Judge Henderson has patiently, professionally, with hearings, consultations, opportunities, proceeded on this problem. And here it is. The state now has changed its mind after agreement. I have tried to understand, is there some legal basis by which a state can just change its mind after it's agreed to all these things? I don't know of any legal principle there. Mr. Brosnahan, in the hearing that is contemplated on contempt or whatever you want to call it, Yes, Your Honor. is there room there, in your view, for the state to argue not a change of circumstance? Well, I don't know about that hearing, but certainly that's what the termination motion, which they filed, I think is all about. I think that is an argument where a record would be developed, and it's an important thing to do. The state, look at what they say. They've declared the problem is solved. That's their position. So once they do that, they're not required, logically, to say how they would fix any problems. We say these problems are existent and they're there. In the termination motion, there will be a hearing. That will be developed. A proper record will be developed, and whatever appellate rights anybody has, I assume, will be pursued and can be pursued in that area. But as to the contempt hearing, everything that Judge Henderson has done since 2001 tells me that whatever rights the states have and the individuals, the governor and the controller, will be pursued. Based on this record, who knows that the controller will not write a check in obedience to a federal judge? I don't know that. And the court can't know it. It's the future. It's unknown. I don't say it will happen. I don't know. But that's the problem with the states attempting to come before Your Honor and describe, and I take it as very clear in this record, there's $250 million. That's a lot of money by anybody's description. But it is the total budget in California for just health is $2.3 billion a year. So the $250 million is about, by my rough math, 13%. Yeah, but things are shrinking rapidly. It couldn't be a worse day for us to argue for vindication of the Eighth Amendment rights. I wanted to get here before it got worse. I mean, it's just awful. It's just terrible. And we understand, I hope, the context. Yeah. But I guess the ‑‑ but I guess my question again is, is there flexibility here for the district court to consider that context? I think so. I think so, and I think that this record says that Judge Henderson will do what the court would want him to do with regard to any such hearing as that. You have said you must have some idea, and we'll be very vigorous down there. I don't want to in any way intimate anything to the court that's less than my state of mind. We want to proceed. This is all planning. This is the second order with regard to contempt, and it's all planning of developments that were once approved as planning the turnaround plan of action, those documents. This is an ongoing matter, and the context that Your Honor has just suggested financially is one that everyone that I know is taking into account the receiver is not in a different situation. And so meetings have been held for eight years. Meetings with, at every level, the transcripts here and so forth, the records show it. Every level of prison officials have been consulted at one time or another. What do they want? They want a lot of these. The officials, now lower officials, the record shows. But what should be done now? That's the planning issue that the court should send back on the grounds that there really isn't jurisdiction. I think Gilmore, just one last word if I may, Gilmore is a thorough case. Judge Fletcher described the issues and talked about principles that I think we all know and recognize as to how a court determines a constitutional analysis, went through it with regard to stay matters and so forth, and all that, and the issues that were in Gilmore. And so when I hear my able colleague talking about these cases in the PLRA, I hear broad statements about curtailing the equity jurisdiction of the courts. I don't think there's anybody in Congress, I hope I'm not speaking too broadly, didn't realize if they actually did that deeply, that would be a large matter. And they would only do it with clear language. And then once they did it, the courts would have to look at it and interpret it. This language isn't that on this point. So if the court pleads for all these reasons, we submit that the court should send it back to Judge Henderson with the confidence that he will do what he's always done, and he will do his careful duty with regard to this matter. Thank you. Thank you, Your Honor. I'd just like to make a couple of brief points. The first is this issue of the motion to terminate versus the consent decree. I mean, sorry, the contempt hearing, and whether the contempt hearing would allow the State to present the issues regarding the scope of the construction program. Now, what I heard counsel say was that what rights the States have will be respected. And when you asked him if we could present whether or not the plan complied with the PLRA, he didn't say yes. And that's because case law is clear that in a contempt hearing, what is at stake is whether or not the State has complied. And, yes, there is a defense of impossibility, but impossibility is not that it's impossible because the law forbids it. Impossible would be the State's checking accounts are empty. The rule you mention is well known. I'm not sure when I look at the contempt, the order to show cause, the alternative order to show cause, when they talk about why they shouldn't be held in contempt for failing to comply with this order, and they'll file a notice identifying any witnesses and a correlation more detailed scheduling order. If the only issue is whether or not the $250 million has been paid, it could be an awfully short hearing. You know. I agree with you. And to be honest, you know, as we had told counsel, we didn't intend to call any witnesses. I mean, I don't know what else is to be held at that hearing besides whether the State has paid or not. Well, I wonder if he's not thinking of witnesses who come in and say, well, here's the read. This doesn't flow from the consent decree, and this doesn't, you know, we don't have the two whole $250 million. We only have, you know, half that or something. I don't know what he's got in mind. I mean, all I know is what the case law says is that you can't challenge an order in a contempt hearing. And we had raised all these issues prior to that. And I think the contempt is a little bit of a red herring. This is an order to pay money. And the Court has contemplated that if we didn't pay that money, we might be subject to contempt. That's always true. And so I think the contempt part of this is actually, again, not really relevant to this Court's jurisdiction. Are you telling us that even if given the opportunity at a follow-on hearing before Judge Henderson, you wouldn't avail yourself of the opportunity to show, A, that the Act prohibits this kind of order, B, that the State can't afford to pay it, C, that we never agreed to this in the appointment of the receiver, and D, whether there even should be a receiver? Are you telling us that? Of course we would have tried. But I think if the district court had said you can't submit any of that evidence, the only question before me is whether or not you complied with the order. Do you think we have anything to say about that? Well, I would hope you would. You know, we obviously think that there should be a hearing or some evidence as to whether or not this meets the requirements of 3626a1a. I think there's a lot of – there were no hearings, no evidence taken, no findings made as to whether it complied with that section. And I think if you look at the – But part of that is because you didn't avail yourself of the hearing. Well, we tried to before we got to the point where he was ordering us to pay money. We did ask for that. We asked to be able to present evidence. We said that this does not meet the requirements 3626a1a with regard to prospective relief, and that there was a lot of evidence in the record that strongly suggests it didn't. The fact that the receiver now has two other plans of differing scope suggests that that first plan that the district court approved of when he ordered us to start paying for it certainly doesn't – isn't the most narrowly tailored means to correct the Eighth Amendment violation. And so we asked for all of that relief. And we were told, pay the money anyway. And in the decision denying our application for a stay, he made very clear, Judge to comply with those requirements. And so, you know, I think you'd be putting the State in a position where if we didn't appeal, we would have gotten to the contempt hearing and possibly been told – probably been told, consistent with the law, you can't now challenge that order. And now we're here challenging the order, and we're told, well, you should have waited for the hearing. And so I think that would have put the State between a rock and a hard place, given – given what the law is regarding what the State or what anyone can offer in a contempt proceeding. Have you ever – have you ever just asked to be relieved of the consent decree? We have, Your Honor. Subsequently, to us – Is that the motion to remove? That's the motion to terminate, Your Honor. Yes. To remove the receiver. Yes. Thank you, Your Honor. Thank you, counsel. The matter just argued is submitted for decision. Well argued, I think. Yes, I would say that the Court appreciates the quality of the arguments presented on both sides. That concludes the Court's calendar for this morning and the Court's minutes adjourned.
judges: Schroeder, Canby, Hawkins